IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRIAN N. WILLIAMS,

                              Plaintiff,

      v.                                            1:06-cv-2161-WSD

MICHELLE MARTIN,
KATHLEEN KENNEDY, LT.
HATCHER, JOHN DOE
CORRECTIONS OFFICERS,

                              Defendant.

## OPINION AND ORDER

This matter is before the Court on the Defendants' Michelle Martin and

Kathleen Kennedy Motion for Summary Judgment [24] and Defendant Shay

Hatcher's Motion for Summary Judgment [25].

## I.     BACKGROUND

Plaintiff Brian N. Williams ("Williams") was formerly incarcerated at

Philips State Prison in Buford, Georgia.  Williams alleges that on October 5, 2004,

during the period of his incarceration, he was beaten and seriously injured by

Defendant Lt. Shay Hatcher ("Hatcher"), a corrections officer employed at the

prison, and other unidentified corrections officers.

Most of the facts surrounding the incident are undisputed.  While Hatcher made his rounds through Williams' dormitory, he saw Williams lying on his bed. Hatcher instructed Williams to get up, and Williams refused.  Hatcher called Williams a "punk," then went to the Unit Manager's office, where he called Corrections Emergency Response Team ("CERT") officers to escort Williams to administrative segregation.[1]  Hatcher then called Williams to the Unit Manager's Office over the PA system.  After Williams entered the Unit Manager's office, Hatcher struck him with a glancing blow, and he and Williams grappled until CERT officers arrived.

Williams specifically testified:

> A:    I go in [the] office and . . . here's Lieutenant Hatcher standing to the side.  And he pushed the door closed.  And he say, so you want to fight me now, right.  And I was like–I looked at him and I turned around to go–to open the door and to go out and he calls on the little radio for the little assault code or whatever it is.  And he puts his hand on the door with . . . his other hand. . . . [S]o I can't leave. So he done called the code.  So he–so he let's his hand that's holding the radio, he lets that go.  And he takes his hand off the door and he swings at me.
>
> Q:    Uh-huh.

_____

[1] Defendants allege that it was standard procedure to use CERT officers to transfer inmates to administrative segregation.

2

A:      So upon hitting me, I just defended myself.

Q:      Where did he hit you?

A:      In my eye.

Q:      Okay.  Right eye–

A:      My face.

. . . .

Q:      Did he get a full-on blow or was it a glancing blow?

A:      It was kind of like a–yeah, a glancing blow because it didn't even knock my glasses off my face.

. . . .

Q:      Okay.  Then what happened?

A:      And then what get to scuffling.  But it wasn't even—

Q:      You said you defended yourself.  What did you do?

A:      Yes.  I hit him back.

Q:      Where did you hit him?

A:      In his face.

Q:      Okay.  Did you get contact with him?

A:      Yeah.

Q:      Okay.  And then what happened?

A:      And then we got tusseled up

Q:      No.  I'm trying to get a blow-by-blow, man.  So what happened?

A:      That's exactly what happened.  This whole thing took six seconds.

Q:      Okay.  So you're both just hitting each other?

A:      No.  We both got like one punch in and then he wrapped me up and then the CERT team came in like six seconds later."

(Williams Dep. at 41-42.)

Williams's earlier written statements to the prison's Internal Investigations

officers and to his own attorney are consistent with this deposition testimony, alleging in essence that Williams entered the office, Hatcher threatened him, then struck him with a glancing blow, then they struggled for a short period of time until the CERT officers arrived.  Williams does not allege that he was injured during this altercation with Hatcher.  He claims that the single blow stuck by Hatcher was "glancing," and not even strong enough to knock off his glasses.

Inmate Robert F. Hall ("Hall") testified that he saw Williams enter the Unit Manager's office.  After Williams entered, the door to the Unit Manager's office shut, and "then the next thing was a lot of banging noises.  And it wasn't as though chairs were hitting the wall.  It was as though Mr. Williams was hitting the wall." (Hall Dep. at 8.)  Prison guard Sergeant Carpenter ("Carpenter") arrived at the Unit Manager's office shortly until after the CERT team in response to Hatcher's call. Carpenter testified that after Williams had been escorted away from the Unit manager's office, Hatcher boasted about confronting Williams.  According to Carpenter, Hatcher "said in front of myself and Mr. Minor that he had . . . started at one end of the room and went all the way around with [Williams] clearing everything off . . . like he put his hands on him and then just started to use him like a dust rag . . . ." (Carpenter Dep. at 17.).

4

Hatcher himself sets forth this same essential series of events before the CERT officers arrived, although he denies striking the first blow.   (Hatcher Aff. at ¶ 7.)  Hatcher claims that after Williams entered the Unit Manager's office, he "reached around Inmate Williams to open the door, [then] Inmate Williams pushed me in the chest.  I then put my hands on Inmate Williams solely to attempt to subdue him.  Inmate Williams responded by striking me with his fists.  I responded by defending against his blows . . . ."  (Id. at ¶ 12.)

After the CERT officers arrived, the record shows that they forced their way into the Unit Manager's office, forcefully subdued Williams, then engaged in some level of force against him until Carpenter intervened, pulling Williams out of the office and shielding him from the CERT team with his own body.  Hatcher's affidavit states that CERT officers pulled him out of the Unit Manager's office into the hall, and that he was not present while CERT officers "subdued" Williams. (Hatcher Aff. at ¶ 14.)  Carpenter testified that he arrived shortly after the CERT officers, and when he arrived, Hatcher was sitting on Williams handcuffing him. Carpenter testified that Hatcher then stood to the side and neither helped nor hindered the CERT officers as they beat Williams:

> Q:    Will you just relate what happened, to your

> knowledge . . . .
>
> A:   I ran up to the unit manager's office.  And from what I remember now, there was myself and I believe it was six other officers went in and Lieutenant Hatcher was sitting on Mr. Williams, putting handcuffs on him, was standing him up. He had just finished putting handcuffs on him from the back.  The officers went in on both sides of Inmate Williams.  They started kicking him.  And then they picked him up and all looked at each other and to signal each other to punch him.  So they all punched at him.  Officer Johns was seen delivering more blows than the rest of them.  I was waiting for Lieutenant Hatcher to stop the beating and he didn't.

(Carpenter Dep. at 6.)

Carpenter later expressly stated that Hatcher did not join the CERT officers in

beating Williams:

> Q:   Okay.  And you never saw Lieutenant Hatcher punch or kick Brian Williams, did you?
> A:   No, I didn't.

(Id. at 26.)

Carpenter testified that he then intervened, pulling Williams away from the CERT

officers and shielding him.  Carpenter testified that Williams appeared injured:

"[Williams's] mouth was bleeding. . . . He was beat up pretty good.  He was about

out cold.  I can remember I was holding him up as much as I could.  He was about

out cold."  (Id. at 9.)

6

Williams's own statements are contradictory and ambiguous regarding Hatcher's whereabout and activities after the CERT officers arrived.  In a letter sent by Williams to his attorney McNeil Stokes on November 23, 2004, which contained the handwritten statement "declared to be true and correct under penalty of perjury" above the signature line, Williams stated that Hatcher attacked him in the Unit Manager's office, then the CERT officers arrived and "beat him to the ground."  The letter makes no mention of Hatcher using force after the CERT officers arrived.  Similarly, in Williams's October 9, 2004, statement to a prison Internal Investigations officer, Williams stated that Hatcher attacked him in the Unit Manager's office, then CERT officers arrived and beat him for "10-12 minutes."  Williams's statement did not allege that Hatcher used force after the CERT officers arrived.

In Williams's April 26, 2007, deposition, he first testified that the CERT officers arrived and "beat him to the ground," but he did not know if Hatcher also used force:

> Q:   So at that point [Hatcher had] only struck you once?
> A:   Yes.
> Q:   Okay.  Then the CERT team comes in?
> A:   Yes

Q:    What happens then?
A:    Then they just had a free-for-all on me.
. . . .
Q:    Okay, so they took you down to the ground?
A:    They didn't take me down to the ground.  They
       beat me to the ground.
Q:    Okay.  Do you know whether they were using their
       hands or their feet or what?
A:    Some was using their hands.  Some was using they
       feet.  I felt flashlights in my back at one point.
Q:    Okay.  Do you know who was doing it or was it
       just all–
A:    No.  It was just a blur of black.
Q:    So you don't even know if Hatcher was in that mix
       or not?
A:    Oh, he was there.
Q:    I understand he was there.  But you don't know
       who hit you when?
A:    No.  I was on the ground.

(Williams Dep. at 45-46.)

Later, Williams again testified that he was unable to see what was happening

while the CERT officers attacked him:

Q:    Well, the door was shut, what did you see?
A:    I don't even know if the door was shut.
Q:    Okay.
A:    I was on the ground.

(Id. at 72.)

Williams again recounted the alleged beating in response to follow-up

examination by his own counsel.  Williams again claimed not to know what had

8

happened after the CERT officers arrived:

> Q:     You testified earlier that the CERT team came in
>        and took you to the ground?
> A:     No.  I said they beat me to the ground.
> Q:     They beat you to the ground?
> A:     Yeah.
> Q:     Who actually was there?  Who came into the
>        office?
> A:     CERT–some CERT team officers.  It was only
>        like–I think like three at the time and then some
>        other officers.
> Q:     Did they pull Hatcher out of the office?
> A:     I don't know.  Like I say, I was on the ground, and
>        I don't know what happened.
> . . .
> Q:     And you don't know what happened to Hatcher at
>        that point?
> A:     No.
> Q:     You don't know if Hatcher was in the room or if
>        Hatcher was in the hallway or where he went?
> A:     Oh, he was in the room, yeah, he was part of
>        the–he was part of the other officers. I told you it
>        was two more regular officers in uniform like him,
>        him and the CERT team officers.  But it could
>        have been more plainclothes officers because I
>        don't know.

(Id. at 93, 98.)

Williams then, during examination by Defendants' attorney, for the first

time speculated that Hatcher may have used force after the CERT officers arrived :

> Q:     And what do you contend Hatcher did [after the
>        CERT officers arrived]?

A:     What he did?

Q:     Yeah.  Did he hit you again?

A:     He hit me a couple more times.

Q:     Did he?

A:     Yeah.

Q:     What did he hit you with?

A:     I don't know what he hit me with.  *I mean I wasn't just trying to focus on him.*  I mean I'm sitting here getting beat. . . .

Q:     Were people kicking you?

A:     Yeah, kicking me.

Q:     Who kicked you?

A:     *I don't know*.  Everybody, I guess.  *I don't know what happened.  I'm on the ground, so I don't know what*.

. . . .

Q:     Do you know what happened to Hatcher after the other officers entered the room?

A:     No, I don't.  No.

. . . .

Q:     After the bear hug, do you recall seeing Hatcher?

A:     Yes.  I mean as he was kicking me in my face or what.

Q:     So you're saying Lieutenant Hatcher kicked you in your face?

A:     I'm saying he *probably* kicked me everywhere.

Q:     No.  No.  I want to know what you remember. . . . Let me ask you the question.  Is it your testimony that Lieutenant Hatcher kicked you in the face?

A:     Yes.

Q:     What else did Lieutenant Hatcher do to you?

A:     I mean he beat me.  I mean--

Q:     Describe it.  Where did he hit you?

A:     I can't describe it.  I mean–

> . . . .
>
> Q:     How many times did he kick you in the face with
>        his boot?
>
> A:     I don't recall.  I couldn't keep count.
>
> Q:     Okay, he kicked you more than one time in the
>        face with his boot?
>
> A:     I don't know.  I don't know how many times he
>        kicked me, sir.

(Id. at 101-104) (emphases added).

Carpenter escorted Williams to the prison's medical wing.  Carpenter testified that Williams was bleeding from his face and was semi-conscious after he was pulled away from the CERT officers.  It is undisputed that Williams suffered cuts, some facial bruising, and edema, but did not suffer any fractures, heavy bleeding, lost teeth, broken ribs, heavy bruising, or other injuries that would reasonably be expected from being kicked in the manner Williams alleges.

Williams also alleges that Defendants Michelle Martin ("Martin") and Kathleen Kennedy ("Kennedy"), the warden and deputy warden of the prison, displayed deliberate indifference to Williams's safety and health, and that the alleged attack was allowed to occur through their deliberate indifference. Williams notes that the number of incident reports generated by prison officials concerning uses of force has remained constant at or above 15 incidents per month during Martin and Kennedy's supervision of the prison.  The number of grievances

11

complaining of excessive use of force filed by prisoners are higher, numbering 113 per month in 2002, 48 per month in 2003, and 52 per month in 2004.  Although the number of incidents alleged by prisoners appears high, the frequency of excessive force allegations has declined substantially during Martin and Kennedy's administration of the prison.

It is undisputed that Martin and Kennedy follow a set of standard operating procedures designed to minimize improper uses of force at the prison.  These procedures include formal processes for prisoners to complain about excessive force.  Prisoners who allege excessive force are evaluated by medical staff, and complaints of excessive force are investigated by the prison's Internal Investigations unit.  Prison guards found to have engaged in unprofessional or improper conduct are reprimanded.  There is no evidence in the record that these procedures were inadequate, or that Martin or Kennedy failed to follow them or applied them inconsistently.  There is also no evidence that Martin or Kennedy had any specific notice of excessive force problems involving Hatcher or Williams prior to the events at issue in this case.

On September 11, 2006, Williams filed a Complaint in this Court seeking relief for alleged violations of his civil rights under 42 U.S.C. § 1983.  On March

12

20, 2007, the Court entered an Order dismissing Williams' claims under § 2340, but allowing his due process and Eighth amendment claims under § 1983 to proceed.  On June 1, 2007, the Wardens file a motion for summary judgment seeking dismissal of Williams's claims.  On June 4, 2007, Hatcher filed a similar motion for summary judgment.

## II.   DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id

13

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."   Scott v. Harris, 127 S.Ct 1769, 1776 (2007).

    A.   Hatcher's Motion for Summary Judgment

Hatcher moves for summary judgment on the grounds that Williams cannot show a genuine issue of material fact regarding Hatcher's use of force.  Hatcher claims that "Plaintiff's version of events . . . *does not reflect that any alleged force used against him by Lt. Hatcher was excessive*."  (Hatcher's SJ Brief at 17.) Hatcher claims that Williams's claims of excessive force should not be believed because "Plaintiff's version of the events . . . changed several times within the course of a single deposition."  (Id.)  Hatcher also argues that Williams's claim that

14

Hatcher kicked him in the face after the CERT officers arrived should not be believed, because Williams's injuries are inconsistent with such a blow.  Hatcher also argues that no other deposition testimony supports Williams claims.  Hatcher specifically argues that neither prisoners with a view of the Unit Manager's office door nor Carpenter testified that they saw Hatcher hit or kick Williams.

The evidence supporting Williams's claim that Hatcher used unconstitutionally excessive force is exceptionally weak.  The depositions and affidavits in this case demonstrate that there is no genuine issue of fact regarding whether Hatcher used excessive force.  Hatcher did not use sufficient force to violate Williams's Eighth Amendment rights before the CERT officers arrived.  Although Williams has presented evidence that CERT officers may have used unconstitutionally excessive force against him, none of those CERT officers are named as Defendants in this action.[2]  Williams's claim that Hatcher used excessive force after the CERT officers arrived is unsupported by the record.  The record does, however, contain evidence that Hatcher may have been deliberately

---

[2]  Williams's complaint asserts claims against several "John Doe Corrections Officers."  "[F]ictitious party practice is not permitted in federal court."  New v. Sports & Rec., 114 F.3d 1092, 1094 n.1 (11th Cir. 1997).  The John Doe officers named in the complaint are thus dismissed.

15

indifferent in protecting Williams from improper force used by CERT officers.

1.   _Before the CERT Officers Arrived_

The record undisputedly shows that before the CERT officers arrived, the following events occurred: (1) Hatcher called Williams to the Unit Manager's office; (2) Hatcher struck Williams; and (3) Williams and Hatcher grappled until the CERT officers arrived.  There is no evidence that the single, glancing blow Hatcher delivered, which was insufficient even to knock off Williams glasses, or the grappling, caused any injury to Williams.

Even if Hatcher used force improperly by punching and then scuffling with Williams, this use of force alone is insufficient as a matter of law to give rise to a claim under the Eighth Amendment.  The Eighth Amendment contains both subjective and objective components: (1) "whether officials act[ed] with a sufficiently culpable state of mind," and (2) "if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation."  Hudson v. McMillian, 503 U.S. 1, 8 (1992).  When prison officials are accused of using excessive physical force on inmates, the Eighth Amendment inquiry becomes "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Id. at 7 (1992).  The only relevant

16

questions are "whether the use of force could have been plausibly thought necessary" by a prison official to restore order, or whether the use of force "evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley v. Albers, 475 U.S. 312, 320-21 (1986). The objective component of the Eighth Amendment inquiry in this context is whether the prison official engaged in "force that is repugnant to the conscience of mankind." Hudson, 503 U.S. at 8.

Whether force is repugnant to the conscience is evaluated under a multi-factor standard. The extent of injury sustained by a complaining inmate is one factor. Id. at 7. Other factors are "the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response." Id. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. Whitley, 475 U.S. at 327. At the same time, however, not every "malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. De minimis uses of force, such as a single push or shove, do not give rise to an Eighth Amendment claim even if the use of force itself is improper. Id.

The Eleventh Circuit applies the objective prong of the Eighth Amendment analysis strictly, allowing claims to proceed only if there is an "objectively, sufficiently serious" injury.  Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006).   The Eleventh Circuit sets a high standard for actionable harm, finding, for example, that a male prisoner forced to masturbate in front of a female guard, Boxer X, 437 F.3d at 1111, and a prisoner pepper-sprayed in the face, Fischer v. Ellegood, ___F.3d___, 2007 WL 1624315 (11th Cir., June 6, 2007) suffered only *de minimus* injuries.

In the present case, there is no evidence that Williams suffered any injury from Hatcher's uses of force before the CERT team arrived.[3]  Williams testified that Hatcher hit him once with a "glancing" blow too weak even to knock off his glasses, then bear-hugged him until the CERT officers arrived.  Even if Hatcher's use of force before the CERT officers arrived was improper, Williams does not

---

[3]  As noted below, Williams suffered and was treated for cuts, bruising, swelling, and headache.  The record contains evidence that after the conclusion of the CERT officers' encounter with Williams, he was bleeding from his face and possibly unconscious.  There is no evidence in the record that Williams received any of these injuries from Hatcher before the CERT officers arrived.  Williams did not testify and does not allege that Hatcher injured him before the CERT officers arrived, and there is no evidence that any of Williams's alleged injuries were caused by Hatcher.

allege and the record does not show any substantial injury. Thus, Williams's

Eighth Amendment claim fails with regard to Hatcher's actions prior to the CERT

officers' arrival.

2.   <u>*After the CERT Officers Arrived*</u>

Viewing the affidavits, depositions, statements, medical information, and

other portions of the record as a whole, the Court concludes that no reasonable

juror could believe that Hatcher used actionable force against Williams after the

CERT officers arrived. Carpenter's deposition testimony and Hatcher's affidavit

expressly state that Hatcher did not use force against Williams after CERT officers

arrived. These statements are consistent with the written statements made by

Williams contemporaneously with the incident.

Williams repeatedly states in his own deposition that he does not know what

happened when he was on the ground and that he did not know what Hatcher was

doing while the CERT officers beat him. Only late in the deposition did Williams

for the first time claim that Hatcher had kicked him after CERT officers arrived.

This claim is inconsistent both with Williams's earlier written statements to prison

officials and his own lawyer, and with Williams's own statements earlier in the

deposition. Taking Williams's statements in context, he does not claim to know

19

for sure that Hatcher kicked him after CERT officers arrived, but rather speculates that Hatcher kicked him based on his knowledge that Hatcher was present while CERT officers beat him.

The medical record is consistent with Hatcher's affidavit, Carpenter's deposition testimony, and Williams's initial statements and deposition testimony prior to the claim that he was kicked.  The record shows that Williams suffered injuries that, while non-trivial, were not of the magnitude expected from heavy kicks to the face by booted feet.

The record, taken as a whole, could not lead a rational trier of fact to conclude that Hatcher used force violating the Eighth Amendment against Williams either before or after the CERT officers arrived.  Williams's allegation that Hatcher used excessive force fail as a matter of law.  Williams's injuries, and his primary complaint, appear to be more properly directed at the CERT officers whom Williams has elected not to name as defendants in this suit.

### 3.    *Deliberate Indifference*

The Eighth Amendment not only prohibits prison guards from using improper force against inmates, it also prohibits guards from allowing prisoners to suffer harm through deliberate indifference.  Farmer v. Brennan, 511 U.S. 825, 832

(1994).  The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates."  Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).  Prison officials specifically "have a duty . . . to protect prisoners from violence at the hands of other prisoners."  Farmer, 511 U.S. at 832.  "[G]ratuitously allowing the beating . . . of one prisoner by another serves no legitimate penological objective."  Id. (citation and quotation omitted).

To be liable for deliberate indifference under the Eighth Amendment for failing to protect a prisoner from violence, "the prison official *must* have subjective knowledge of the risk of serious harm and *must* nevertheless fail to reasonably respond to the risk."  Murphy v. Turpin, 159 Fed. App'x 945, 947-48 (11th Cir. 2005).  The prison official must also have a sufficiently culpable state of mind.  Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003).

A genuine issue of material fact exists regarding whether Hatcher committed deliberate indifference by handcuffing Williams and then passively watching the CERT officers beat him.  The Eleventh Circuit has found issues of fact to exist on deliberate indifference claims when a prison guard passively watched one inmate seriously attack another.  See, Murphy, 159 Fed. App'x at 948 ("Weiler's failure to intervene after Thomas threatened to kill Murphy, and only after the fight broke

out, may, if proved, satisfy the subjective element of a deliberate-indifference claim.") In this case, taking Williams's allegations as true, Hatcher handcuffed Williams and then observed several CERT officers beat him for an extended period of time. The beating resulted in injuries that may have been or appeared fairly serious. Hatcher's observation of the beating is *ipso faco* subjective knowledge that Williams was at risk of serious harm.

The record further demonstrates an issue of fact regarding whether Hatcher failed to respond reasonably to the risk of harm to Williams posed by the CERT officers. Taking Williams's allegations as true, particularly as corroborated by Carpenter's testimony, Hatcher did nothing to stop the improper use of force by CERT officers. The record suggests that CERT officers continued to beat Williams until Carpenter, a sergeant, intervened and pulled Williams to safety. It is significant that Hatcher is a lieutenant, and appears to have been the only guard officer present. As an officer, any reasonable response by Hatcher to an improper use of force by a subordinate guard would involve ordering a stop to the improper use of force. Hatcher did not order the CERT officers to stop beating Williams or otherwise attempt to end the improper use of force, but rather declined to intervene. The law imposes a duty on prison guards to protect inmates from

improper violence by other inmates; it is inconceivable that a prison guard officer does not have a similar–if not a heightened–duty to protect inmates from improper uses of force by subordinate guards.

Although the injuries suffered by Williams from Hatcher's hands alone were *de mimimus*, the use of force allegedly permitted through Hatcher's deliberate indifference were not.  The record shows a genuine issue of fact regarding the extent of Williams's injuries.  Although Defendants allege Williams suffered mere scratches and bruises, Williams and Carpenter testify that the beating left Williams bloody and at least partly unconscious.

      B.      <u>Martin and Kennedy's Motion for Summary Judgment</u>

          1.     *Deliberate Indifference*

Martin and Kennedy argue that the record shows no evidence to hold them accountable for any deprivation of Williams's rights that may have occurred.  A claim under 42 U.S.C. § 1983 cannot be based upon vicarious liability.  <u>Brown v. Smith</u>, 813 F.2d 1187 (11th Cir. 1987).  Kennedy and Martin must have committed some personal act or omission creating an affirmative link with the alleged deprivation of rights.  <u>Zatler v. Wainwright</u>, 802 F.2d 397 (11th Cir. 1986).  There must, in other words, "be some causal connection between the actions of the

supervisory official and the alleged deprivation." Wilson v. Attaway, 757 F.2d 1227, 1241 (11th Cir. 1985). "The causal connection may be established where a history of widespread prior abuse puts the official on notice of the need for improved training or supervision." Id.

Williams does not allege that Kennedy or Martin were in any way directly or personally involved with the alleged attack. No fact in the record shows that the Wardens had any specific knowledge that Hatcher or any member of the CERT team might use excessive force prior to the date of the alleged incident.[4] Carpenter and Hall both testified that they had not seen Hatcher use excessive force prior to the incident alleged here. They testified that they had never witnessed a prior use of excessive force by any correction officer at the prison. Williams testified that he had witnessed Hatcher engage in one incident of excessive force prior to the events at issue in this case, but admitted that he never notified Kennedy or Martin of any excessive force issue with Hatcher prior to his

---

[4] The evidence Williams relies on to show knowledge on the part of Kennedy and Martin, particularly evidence of another excessive force incident involving inmate Bryan Graham and a phone call to Martin from Carpenter's wife, occurred after the date of incident alleged in Williams's complaint. These incidents do not support a claim that Martin or Kennedy had knowledge of or were deliberately indifferent to an excessive force problem at the prison on the date of the attack alleged by Williams.

24

present allegations.

Williams does not offers any evidence of specific incidences or widespread conduct involving excessive force at Phillips State Prison that would form the basis for a claim that Kennedy and Martin were deliberately indifferent or negligently supervised the prison staff.  Williams lists a number of cases in this district alleging prisoner abuse.  All but two of these cases allege incidents of abuse at other prisons.  Only one case names Kennedy or Martin defendants, and its alleged events occurred after the events alleged in the present case.

Williams further alleges that the sheer number of claims of excessive force by prisoners should have provided notice of a problem that Kennedy and Martin chose to ignore.  The Court notes, however, that the number of excessive force claims at Phillips State Prison decreased during Kennedy and Martin's supervision. Williams presents no evidence that the decrease in reporting of excessive force incidents was caused by anything other than a decrease in excessive force events. These numbers suggest that Kennedy and Martin were taking an active role to eliminate any problem that might have existed.

It is undisputed that Kennedy and Martin implemented policies and procedures to prevent and deal with excessive force.  Prisoners could complain

about uses of excessive force.  If prisoners complained, they were evaluated by medical staff.  The Internal Investigation unit would then investigate the allegation and recommend appropriate action to Martin and Kennedy.  Internal Investigations conducted in inquiry into Williams's case and concluded that Hatcher's use of force was not excessive, but that Hatcher had made unprofessionally provocative statements to Williams.  Martin reprimanded Hatcher based on this finding.

Williams offers no evidence to show that these procedures were a sham, or that they were so ineffective that the procedures themselves amount to deliberate indifference on the part of Kennedy and Martin.  Williams makes only the conclusory and unsupported claim that:

> [I]t takes five entities to participate and to cover-up the beatings. It takes the guards to engage in the beating of inmates. It takes the first level supervisors to condone the beatings. It takes medical personnel intentionally to cover-up the injuries that result from such beatings. It takes the Warden and Deputy Warden to cover-up the beatings. And, finally, it takes Internal Affairs to whitewash the subsequent investigations of the scores of beatings.

(Pls. Resp. at 24.)

The record contains no evidence to support this alleged "five entity" conspiracy.

Summary judgment in favor of Kennedy and Martin is thus appropriate.

2.      *Qualified Immunity*

Even if a genuine issue of fact existed regarding whether Martin and Kennedy were deliberately indifferent to Williams's rights, they are entitled to qualified immunity.  State officials are immune for suit for discretionary acts performed in good faith while acting within the scope of their authority, unless their conduct violates a "clearly established statutory or constitutional right of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Court must first examine "whether the plaintiff's allegations, if true, establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730, 736 (2002).  If the Court determines that the allegations establish a constitutional violation, then the Court must determine whether the potentially violated right was "clearly established."  Id. at 739.  The state official needs only "fair warning" that their conduct was unconstitutional for a right to be "clearly established."  Id. at 741.

It is undisputed that Martin and Kennedy had responsibility for ensuring the safety of prisoners and implementing use of force standards for correctional officers at Phillips State Prison.  It is undisputed that any deliberate indifference or failure to supervise by the Wardens that resulted in excessive uses of force would

27

be part of a "discretionary function."

Williams's allegations, if true, do not establish a constitutional violation on the part of the Wardens.  Williams makes no specific showing that Kennedy or Martin were personally involved in any alleged use of excessive force, that they exercised deliberate indifference in their supervision of Hatcher, the CERT officers, or any other prison official involved in any alleged use of excessive force, or that they failed to maintain a system of monitoring or accountability for uses of force in the prison.  Martin and Kennedy are thus protected from suit by qualified immunity.[5]

---

[5]  Hatcher, in his reply brief, makes a conclusory claim of qualified immunity.  No qualified immunity argument appears in Hatcher's Summary Judgment Motion.  Hatcher does not assert that he was engaged in a "discretionary function" by passively observing CERT officers beat Williams.  Even if Hatcher was engaged in a discretionary function, he would not be entitled to qualified immunity.  Prisoners have an Eighth Amendment right to be free "cruel and unusual punishment" from improper uses of force, whether by prison guards or other inmates, and also to be free from deliberate indifference by prison officials resulting in harm.  See Hudson v. McMillian, 503 U.S. 1, 8 (1992).  This right is clearly established, and the law states unambiguously that prison guards are not permitted to allow inmates to come to harm, regardless of whether the guard is the initiator of violence or merely exercises deliberate indifference by failing to respond reasonably to a known risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Hatcher is not entitled to qualified immunity.

**III.    CONCLUSION**

**IT IS HEREBY ORDERED** that Defendants' Michelle Martin and

Kathleen Kennedy's Motion for Summary Judgment [24] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Hatcher's Motion for

Summary Judgment [25] is **DENIED**.

**SO ORDERED** this 29th day of October, 2007.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE